IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 4:24-MJ-306 |
| CHRISTOPHER REINHARD BROWN (01) | |

## CRIMINAL COMPLAINT

I, Special Agent Michael Vizsolyi, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

From at least as early as June 2020, until at least as recently as September 14, 2022, in the Fort Worth Division of the Northern District of Texas and elsewhere, the defendant, **Christopher Reinhard Brown**, along with others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to commit wire fraud, in violation of 18 U.S.C. § 1343, that is, to knowingly devise and execute a scheme to defraud and to obtain property by means of materially false pretenses, representations, and promises, using and causing the transmission of wire communications in interstate commerce in furtherance of the scheme. For the purposes of executing that scheme, as described below, **Brown** knowingly caused to be transmitted emails such as loan documents, profit participation agreements, commitments to fund, and excuses as to why loans did not fund to unindicted Coconspirator No. 1, who resides in the Northern District of Texas, all done in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1343).

## INTRODUCTION

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7), Title 18, United States Code, in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been employed as a Special Agent with the Federal Bureau of Investigation (FBI), Department of Justice, and have been so employed since June 6, 2021. As an FBI

Criminal Complaint - Page 1

Special Agent, I was assigned to the White-Collar Crime Squad with primary investigative responsibilities involving criminal matters particularly related to economic or white-collar crime since 2021. I have investigated fraudulent schemes involving money laundering, wire fraud, and investment fraud. As an FBI Special Agent, I have participated in all the normal methods of investigation, including, but not limited to: electronic surveillance, visual surveillance, interviews of witnesses, the execution of search warrants, the use of confidential informants and cooperating witnesses, and the use and analysis of financial records and toll records. I am vested with the authority to investigate violations of Federal laws, including Title 18 and Title 26, United States Code (U.S.C.).

3. The facts set forth in this Affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents, government agencies, and witnesses. Because this affidavit is being submitted for the limited purpose of supporting the issuance of a criminal complaint and arrest warrant for the defendant, I have not set forth in this affidavit everything that I have learned as a result of this investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause that a violation of federal law has been committed.

4. Based on your Affiant's training, experience, participation in this investigation, and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1349 (18 U.S.C. § 1343), conspiracy to commit wire fraud, have been committed by **Christopher Reinhard BROWN**, by and through various entities under the custody or control of **BROWN**, including but not limited to, Brown Capital Funding

International (BCFI), as well as by and through various entities under the custody or control of unindicted Coconspirator No. 1 including, but not limited to, Nottingham Ventures (NHV).

## PROBABLE CAUSE

### Background

5. I am familiar with the information contained in this affidavit, either through personal investigation or through discussion with other law enforcement officers, government agencies, and employees, who have participated in and have contributed documentary reports of their investigative efforts in this matter. The following information is only a summary of some of the facts and evidence identified in this case sufficient to establish probable cause.

6. Beginning in or around December 2021, the FBI Dallas, Fort Worth Resident Agency opened an investigation after receiving allegations of an investment and loan scam carried out by **BROWN** and unindicted Coconspirator No. 1, utilizing the entities BCFI and NHV, respectively. In February 2022, allegations of other, similar investment fraud schemes were received relating to BCFI and NHV, and owner/operators **BROWN** and unindicted Coconspirator No. 1, respectively.

7. As part of my training and experience as an FBI Special Agent, I have become familiar with financial fraud schemes perpetrated against investors, individuals and entities seeking private loans, commonly referred to as Advance-Fee Loan Schemes. In these schemes, perpetrators represent to potential loan applicants the ability to provide unusually large loans with little to no collateral required from the borrower. The

perpetrator often makes false representations regarding their financial background and history of funding loans to the borrower. The perpetrator typically asks the borrower to provide some sort of up-front fee for the purposes of securing the loan, whether to the perpetrator themselves or to a coconspirator, most often assisting in the brokering of the loan. Typically, in these schemes, the perpetrator has no ability to fund the loan and, once the borrower has paid their up-front fee, the perpetrator and/or coconspirator will end the relationship with the borrower.

8. Another type of fraud with which I am familiar is commonly referred to as a Standby Letter of Credit (SBLC) Scheme. In these schemes, perpetrators typically represent to potential victims that SBLCs, which are bank accounts with high values typically ranging from $10 million to $1 billion, can be leased for a fraction of their value. Perpetrators typically then represent that the leased SBLCs can be utilized by the lessor and/or perpetrator for various purposes, such as trading on an international market. Often, perpetrators will intentionally make these schemes overly complex, utilize "paymasters" such as escrow attorneys, and cite Nondisclosure Agreements (NDAs) to remain secretive. SBLCs, as marketed by the perpetrators of these schemes, do not exist. Typically, victims who provide money to lease the SBLC will be presented with a false bank statement or bank letter by the perpetrator and/or coconspirator.

9. According to victim-provided emails, emails obtained via a search warrant, business records, financial records, and interviews conducted by the FBI, beginning as early as 2020, victims provided unindicted Coconspirator No. 1 with approximately

$8,275,000.00 for the establishment of a Good Faith Account (GFA) for the purposes of large private loans funded by **BROWN** and/or BCFI.

Brown's Representations to Borrowers

10.     **BROWN** represented to brokers and victims one of two things: (1) BCFI represented a family of oil billionaires in Texas who gave out large private loans for projects; or (2) **BROWN** himself was the heir to the oil money that would be utilized to fund the loans. The FBI has obtained a recording of **BROWN**, in which he represents that he is the fifth generation of an oil family and uses the money from the oil to fund large loans at a low interest rate. The FBI has found nothing to substantiate those claims. Further, witnesses and those close to **BROWN** state that **BROWN** invented the story. Witnesses said that **BROWN**'s mother may have received small residual payments from an oil share, but nothing substantial. Further, **BROWN**'s own under-oath deposition to the United States Securities and Exchange Commission (SEC) refutes that claim, described further below. The FBI interviewed **BROWN**'s former partner at BCFI who admitted that there was no billionaire oil family and that the representations made by **BROWN** were false. **BROWN**'s partner explained that **BROWN**'s true intent was to utilize the money borrowers placed into a GFA to engage in Prime Bank Note Trading, a version of the SBLC scheme I described above.

11.     To attract potential borrowers, **BROWN** owned a website, https://www.browncapital.biz. According to records obtained by the FBI, **BROWN** owned and paid for the website. According to an FBI obtained recording, **BROWN** claimed ownership of the website. According to an under-oath deposition **BROWN**

Criminal Complaint - Page 5

made to the SEC, **BROWN** was responsible for the content of the website. Screenshots of the website obtained on December 17, 2021, show that **BROWN** represented BCFI as a 50-year-old company. Information obtained from the Georgia Secretary of State indicated, however, that **BROWN** formed BCFI in the state of Georgia in 2017. The website highlights BCFI's loan process. On the website, **BROWN** claims to only accept loan applications of more than $40 million and have no maximum loan BCFI can provide.

12.    According to **BROWN**'s testimony provided under-oath to the SEC on February 23, 2021, BCFI's business is "to make capital available for shovel-ready projects." When asked where BCFI would get the capital, **BROWN** responded, "We would just look on the internet and see if we could find a source of capital." When asked whether BCFI had located capital for a shovel-ready project in the past five years, **BROWN** responded "No." When asked about where **BROWN** got the information for his website, https://www.browncapital.biz, **BROWN** said, "I just wrote it. Just made it up out of my brain." During the testimony, **BROWN** claimed ownership of the email accounts crbrowncapital@gmail.com and cbrown@browncapital.biz.

13.    In some instances, the victims themselves were looking to obtain a large loan (more than $40 million) from **BROWN** and BCFI and sent funds for the establishment of a GFA; in other instances, victims who were not related to the loan invested their money, which had promised returns, expecting that money to be used to create a GFA for the loan.

### Connection Between unindicted Coconspirator No. 1 and Brown

14. Unindicted Coconspirator No. 1 served as a go-between between **BROWN** and victims and/or brokers representing the victims. In this role, unindicted Coconspirator No. 1 reviewed and edited business documents provided by victims and other potential borrowers. Unindicted Coconspirator No. 1 then sent the documents to **BROWN** for approval and/or further revisions. Unindicted Coconspirator No. 1, who resided in Southlake, TX, would frequently forward emails from **BROWN**, who resided in Atlanta, GA, to victims/brokers and from victims/brokers to **BROWN**. In some instances, unindicted Coconspirator No. 1 wrote the content of emails which **BROWN** would represent as his own.

15. Coconspirator No. 1 served as an official broker for BCFI. This is evidenced by a document sent by **BROWN** to Coconspirator No. 1 via email, titled "Step By Step Procedures," which is a ten-step list for the loan process with BCFI. This document is initialed by **BROWN** and Coconspirator No. 1. During an FBI interview of Coconspirator No. 1, Coconspirator No. 1 said he served as an official broker for BCFI.

### Good Faith Account Scheme

16. According to FBI interviews and signed documents provided by victims and the brokers who represented the victims, the GFA was solely for the purpose of the loan between the loan applicant and BCFI. A bank account should have been established for the GFA to hold the investor money until the loan between BCFI and the borrower closed. According to a Consulting Agreement sent by Coconspirator No. 1 to victims, "the funds are not at risk at any point and can be withdrawn if there is a non-performance

Criminal Complaint - Page 7

of any of the contractual obligations by Brown Capital Funding International." According to a Buy-Sell Agreement between NHV and victims: if the loan with BCFI funded, investors in the GFA would receive "125% of each minority member's initial contribution"; if the loan with BCFI failed to fund, investors would receive their "initial contribution plus interest at the rate of 15% per annum." According to the victims' brokers it was presented as a "zero risk" investment because investors should have been able to get their money back at any time.

18. During 2020-2021, a portion of the victims wired $5 million to an Interest on Lawyers' Trust Account (IOLTA) account in the name of Arizona IOLTA Trust Accounts Curtis Law Firm, PLC. Coconspirator No. 1 told the victims via email and on a conference call, of which the FBI has obtained a recording, that two GFA accounts were established, housing their $5 million along with Coconspirator No. 1's contribution of $19.5 million. Other victims, who themselves were applying for a loan with BCFI, contributed approximately $3,275,000 for Coconspirator No. 1 and NHV to establish a GFA for their loans. Victim-provided emails and emails obtained from a search warrant of Coconspirator No. 1's email accounts, support this version of events.

18. In both cases, the loans with BCFI did not fund by the deadline. Subsequently, **BROWN** and Coconspirator No. 1 provided varying excuses for the loans not funding. The victims requested their money back from Coconspirator No. 1 but were told that Coconspirator No. 1 cannot get their money back. According to emails from Coconspirator No. 1 to victims, as recently as April 2022, Coconspirator No. 1 stated he could not return their investment but was working other deals to try to return their money.

19. On or about September 23, 2020, Coconspirator No. 1 sent an email containing an attachment of a JP Morgan Chase (Chase) bank statement and account summary to a victim as proof that a GFA was established using the victim's funds. These statements were fake. These bank statements were fraudulently created by an additional coconspirator. Coconspirator No. 1 provided these fake statements to other victims in this case, which have also been confirmed as fraudulent. Chase bank has never employed the bankers listed on the statements, and the account numbers do not exist at Chase bank. Further, based on PDF meta-data, it was determined that the statements were edited to reflect the dollar amounts and account numbers put forth to the victims.

20. According to a financial analysis of records obtained from the financial institutions where the victims sent their money, their money was not used to create a GFA. Rather, victim money was used for luxury or personal purchases by Coconspirator No. 1 and sent to other potential coconspirators in the scheme. According to the victims and brokers, the victims would not have invested in the scheme had they known that their money would be used for personal or luxury expenses; would not have invested had they known their money would be intermingled in any other deal; would not have invested had they known their money would not be placed into a protected GFA; and would not have invested had they known their money would be used in any way other than what was represented to them.

21. As mentioned earlier, integral in these schemes was the victim's belief in **BROWN**'s ability to fund these loans. In furtherance of this belief, **BROWN** provided loan documents via Coconspirator No. 1, such as the Commitments to Fund and Profit

Participation Agreements, which were then provided to potential borrowers and victims. When one of the loans did not fund, **BROWN**, who resided in Georgia, sent an email on July 6, 2021, directly to a victim, residing in Florida, stating that "the loan is still going forward. But there are issues that have been discovered during further due diligence on both sides. With our strict non disclosure [sic] policy there can not be any side agreements with other advisors."

22. On August 21, 2023, the FBI interviewed **BROWN** regarding his participation in the fraud. **BROWN** acknowledged his role in the scheme, and Coconspirator No. 1's role as a BCFI broker. **BROWN** admitted that he would rewrite verbatim text messages from Coconspirator No. 1, which he would then send via email from his email account to make it appear as if they came **BROWN** and were his own words.

23. Further in the interview, **BROWN** stated that he had never funded any loans or had any successful deals with BCFI. Further, **BROWN** stated that he planned to use the internet to find wealthy people to help fund loans. Later in the interview, **BROWN** admitted that he planned to engage in Platform Trading with loan applicants GFA funds, a version of the SLBC fraud scheme mentioned earlier. Even though the FBI admonished **BROWN** to stop misrepresenting himself and BCFI to the public, as late as March 2024, Brown continued to solicit clients with misrepresentations regarding his himself, his finances, and his record of past successes.

## CONCLUSION

24. Based upon the above facts and circumstances, I respectfully submit that there is probable cause to believe that **BROWN** was an active participant, along with others known and unknown, in a conspiracy where a scheme to defraud investors and potential loan applicants was executed, resulting in the loss money and property, by means of materially false and fraudulent pretenses, representations and promises, and concealment of material information, and for the purpose of executing that scheme, he caused to be transmitted by means of wire communications emails to Coconspirator No. 1 and victims, all done in violation of 18 U.S.C. § 1349 (18 U.S.C. § 1343).

Michael Vizsolyi, Special Agent
Federal Bureau of Investigation

SWORN AND SUBSCRIBED before me, April 23, 2024, at 1:24 a.m./p.m., in Fort Worth, Texas.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE